[Cite as *State v. Echols*, 2021-Ohio-4193.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 19AP-587 |
| v. | : | (C.P.C. No. 18CR-2869) |
| David J. Echols, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 30, 2021

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney and *Sheryl L. Pritchard* for appellee. **Argued:** *Sheryl L. Pritchard.*

**On brief:** *Carpenter Lipps & Leland L.L.P., Kort Gatterdam,* and *Eric P. Henry,* for appellant. **Argued:** *Kort Gatterdam.*

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, David J. Echols, appeals the judgment of the Franklin County Court of Common Pleas, finding him guilty of two counts of murder each with a three-year firearm specification, two counts of attempted murder each with a three-year firearm specification, and two counts of felonious assault each with a three-year firearm specification. The two murder charges merged, and the felonious assault charges merged into the attempted murder charges, and appellant was ultimately sentenced to an aggregate period of 30 years to life incarceration.

{¶ 2} The plaintiff-appellee, State of Ohio, alleged that on June 9, 2017, appellant and an unidentified accomplice shot multiple rounds into a vehicle from a short distance away, causing the death of passenger Damon Waddell and severe injury to the driver, Tyanna West. A second passenger, Shaiquon Sharpe, seems to have escaped injury, but Sharpe did not appear at trial and his whereabouts are apparently unknown.

{¶ 3}    At the time West, Waddell, and Sharpe were driving around the area of West's home at 1161 Loretta Ave., and after West saw her sister's father "Brandon" outside 1047 Loretta Ave., she stopped the vehicle in the middle of the street, intending to speak with him. She then saw other people nearby, including appellant and his brother James. A few months earlier, West's younger brother D'ante had been shot and killed, and although at the time of this trial no one had been arrested for D'ante's death, West believed that appellant was responsible. West had placed commemorative stickers honoring D'ante on her vehicle.

{¶ 4}    West stated that when she first saw appellant, he was approximately ten feet away from the car. She testified that after appellant said "what's up" to her and she said "what's up" back to him, he immediately began shooting at her vehicle, but she admitted that she did not see appellant with a gun prior to the shooting and could not identify the type of gun used. She quickly drove away, telling Waddell they were going to get help, and fled to her grandmother's house, which was approximately six blocks away. When they arrived, Sharpe exited the vehicle and left the scene.

{¶ 5}    West then attempted to obtain assistance from one of her grandmother's neighbors, Latisha Laramore. Ms. Laramore testified she heard the gunshots and saw the vehicle stop in front of her house and heard West state that "they shot us" and that "David" had shot them. Ms. Laramore called 9-1-1, and police arrived a few minutes later.

{¶ 6}    Columbus Police Officer Christopher O'Neall testified at trial that when he and his partner arrived on the scene, West was hysterical and stated that "the same guy that killed my brother, shot him," and told him that the shooter's name was "David." (June 25, 2019 Tr. Vol. II. at 320.) Officer O'Neall examined Waddell but was unable find a pulse. Medics arrived shortly thereafter and pronounced Waddell dead at the scene.

{¶ 7}    O'Neall's partner Officer Rick Foster similarly testified that when he arrived at the scene, he heard West screaming that "he shot me," and that when he asked her who shot her, she answered "David," and repeated it several times. *Id.* at 514. West also stated to Officer Foster that it was the same person who shot her brother in May 2017. *Id.* at 515. Officer Foster also testified that he visually evaluated West's injuries and that she appeared to have been shot in the leg and in the hand, but that her injuries were not life-threatening. After West was taken to the hospital, Officer Foster interviewed some neighborhood

witnesses at the scene, and that one of them told him that she knew who "David" was and provided him a Facebook photo of appellant under the screenname "David RIP Ace Loc." *Id.* at 522.

{¶ 8} Columbus Police Officer Alex Kistner arrived at the scene around the same time as Officers O'Neall and Foster. Officer Kistner also checked Waddell, but he too was unable to find a pulse. Officer Kistner activated his body camera as he arrived at the scene, and footage from the camera was admitted at trial. He also testified that he was able to match the Facebook photo and screen name "David RIP Ace Loc" to a law enforcement photo of the defendant, David Echols, and informed homicide detectives arriving at the scene of the match. *Id.* at 360-62.

{¶ 9} West was transported to Riverside Methodist Hospital, and while she was receiving treatment for multiple gunshot wounds, she was visited by a detective who showed her a photo array including appellant, and she identified appellant as the shooter. The following day, she was able to identify James Echols in a different photo array, although she had only seen photos of him on social media and had not seen him in person prior to the incident.

{¶ 10} The police recovered 16 bullet casings as well as several bullets and bullet fragments from the scene of the shooting. A crime lab examiner concluded that the bullets and fragments fired that day came from 2 different guns, one of which fired at least nine shots, and the other fired at least 7. West testified that she believed only one gun had been fired that day, although she estimated that more than 10 shots were fired at the vehicle. Evidence at trial indicated that 6 bullets struck the outside of the driver's side of the vehicle, but there was no evidence of anyone firing a gun from inside the vehicle.

{¶ 11} Appellant was a juvenile at the time of the shooting. On July 13, 2017, a complaint was filed against him in the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Division, alleging one count of murder and two counts of felonious assault, and the juvenile court approved the addition of firearm specifications to those charges four days later. The state then filed a motion to transfer jurisdiction to the General Division of the Franklin County Court of Common Pleas for prosecution of appellant as an adult. Following a competency evaluation and a hearing, the  juvenile court

concluded that there was probable cause as to the charges of the murder of Waddell and as to the felonious assault of West.

{¶ 12} The Franklin County Grand Jury returned an indictment against appellant on June 26, 2018, charging him with the murder of Waddell, the attempted murder and felonious assault of West, and the attempted murder and felonious assault of Sharpe. All charges included firearm specifications. Following a jury trial, on June 27, 2019, a jury found appellant guilty of all counts. In a sentencing hearing on August 14, 2019, the trial court concluded that several of the charges were allied offenses and merged them, and ultimately sentenced appellant to a total period of 30 years to life with 24 years of that sentence as mandatory incarceration. The trial court also concluded that appellant had a duty to register as a violent offender upon release. This timely appeal followed, and appellant asserts 9 assignments error with respect to the trial court's judgment.

> **Assignment of Error No. 1:** Mandatory bindovers under R.C. 2152.12(A)(1)(a)(i) violate due process and equal protection rights guaranteed under the United States and Ohio Constitutions.

{¶ 13} Appellant first argues the Ohio mandatory-bindover procedures in Ohio do not satisfy either procedural or substantive due process under *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) and *Kent v. United States*, 383 U.S. 541, 557-61 (1966).

{¶ 14} The arguments presented in this assignment of error have already been rejected by the Supreme Court of Ohio, *see State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956 ("*Aalim II*"), and appellant admits in his brief that he "raises this issue in order to preserve it for further review." (Appellant's Brief at 18.) In accordance with the Supreme Court in *Aalim II*, appellant's first assignment of error is overruled.

> **Assignment of Error No. 2:** The juvenile court erred by finding probable cause existed to transfer this matter to adult court in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 15} At the bindover hearing held December 21, 2017 and May 31, 2018, the juvenile court concluded that the state had established probable cause to transfer jurisdiction of appellant to the general division for the murder of Waddell and the felonious assault of West. *See, e.g.,* May 31, 2018 Franklin C.P. No. 17JU-8946 at 80-83. In his second

assignment of error, appellant contends that the juvenile court's finding of probable cause was erroneous.

{¶ 16} Under R.C. 2152.12(A)(1)(a)(i), if a complaint is filed alleging that a child is a delinquent "for committing an act that would be * * * murder * * * or attempted murder if committed by an adult," the juvenile court "*shall transfer the case* if * * * [t]he child was sixteen or seventeen years of age at the time of the act charged and there is probable cause to believe that the child committed the act charged." (Emphasis added.) Accordingly, murder and attempted murder are mandatory-bindover offenses for a seventeen-year-old child like appellant. And although felonious assault under R.C. 2903.11(A) would normally be a discretionary-bindover offense under R.C. 2152.10, because it was filed as part of the same "case" the statute requires transfer of that charge as well. *See, e.g., State v. Cockrell*, 1st Dist. No. C-150497, 2016-Ohio-5797, ¶ 15-17 (holding that "the legislature intended to allow the juvenile court to bind over charges that are not mandatory-bindover offenses along with those that are mandatory-bindover offenses as long as * * * the additional charges arose from a common nucleus of operative facts as the offenses for which probable cause was found").

{¶ 17} In *In re A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, the Supreme Court law regarding the standard of review for juvenile court probable-cause determinations, concluded that "a juvenile court's probable-cause determination in a mandatory-bindover proceeding involves questions of both fact and law," and concluded that appellate courts must "defer to the trial court's determinations regarding witness credibility," but "review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged." *Id.* at ¶ 51. The Supreme Court further clarified the state's burden at a probable-cause bindover hearing:

> "[T]he state must provide credible evidence of every element of an offense to support a finding that probable cause exists to believe that the juvenile committed the offense before ordering mandatory waiver of juvenile court jurisdiction pursuant to R.C. 2151.26(B) [now R.C. 2152.12(A)(1)(a)]. * * * In meeting this standard, the state must produce evidence that raises more than a mere suspicion of guilt, but *need not* provide evidence proving guilt beyond a reasonable doubt."

(Emphasis sic.) *Id.* at ¶ 42, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001).

{¶ 18} Given the foregoing standards, the question presented by appellant's second assignment of error is whether the state produced evidence of guilt as to every element of the mandatory-bindover offenses. Appellant admits that there is probable cause that both the crimes alleged in the complaint were committed but contends that there was insufficient evidence of identity presented to establish probable cause.

{¶ 19} West testified at the probable-cause hearing: she stated that she saw and spoke with appellant the day of the shootings, that appellant was the person who "started shootin' " at both her and the car containing Waddell and Sharpe that day and identified appellant in the courtroom. (May 31, 2018 Franklin C.P. No. 17JU-8946 Tr. at 45-47.) West's testimony provided sufficient evidence to support the juvenile court's conclusion finding probable cause that appellant committed the murder of Waddell and the attempted murder of West herself. Accordingly, appellant's second assignment of error is overruled.

> **Assignment of Error No. 3:** The trial court entered a judgment of conviction for matters alleged in counts five and six of the indictment that were still within the exclusive jurisdiction of the juvenile court.

{¶ 20} In his third assignment of error, appellant observes that at the juvenile court probable cause hearing, but prior to the juvenile court's order of bindover, the state voluntarily dismissed the charges relating to Sharpe. *See Id.* at 80-81. He therefore argues that those two charges were not transferred to the General Division of the Franklin County Court of Common Pleas, and that the trial court lacked jurisdiction to enter convictions for those charges.

{¶ 21} Under prior versions of the bindover statute, once a child was bound over for one felony, he or she was treated as an adult for any other prosecutions. But that is no longer the case. As the Supreme Court has observed:

> In *State v. Adams*, 69 Ohio St.2d 120, 431 N.E.2d 326 (1982), this court held that once a juvenile is bound over, the juvenile is bound over for all future felonies. *Id.*, syllabus. However, the General Assembly expressly overruled this holding as acknowledged in the legislative notes to R.C. 2151.011:
>
> The General Assembly hereby declares that its purpose in enacting the language in division (B) of section 2151.011 and divisions (B) and (C) of section 2151.26 of the Revised Code that exists on and after the effective date of this act *is to overrule the holding in State v. Adams (1982), 69 Ohio St.2d*

> *120 [431 N.E.2d 326], regarding the effect of binding a child over for trial as an adult.*
>
> (Emphasis added.) Am.Sub.H.B. No. 1, Section 3(B), 146 Ohio Laws, Part I, 1, 96.
>
> In other words, in the wake of Adams, the General Assembly prohibited juvenile courts from holding that once a juvenile has been bound over to adult court, the juvenile will be bound over in all future felonies. * * * *According to statute then, a juvenile court cannot bind over a juvenile on the sole basis that the juvenile has been previously bound over.*

(Emphasis added.) *State v. D.W.*, 133 Ohio St.3d 434, 445-46, 2012-Ohio-4544, ¶ 45-46. *D.W.* recognizes that the legislature overruled the first paragraph of the *Adams* syllabus, which held in relevant part that "[o]nce a juvenile is bound over in any county in Ohio * * * that juvenile is bound over * * * for future felonies he may commit." *State v. Adams*, 69 Ohio St.2d 120, 431 N.E.2d 326 (1982), paragraph one of the syllabus, abrogation recognized by *D.W.* at ¶ 45-46.

{¶ 22} But appellant has not identified any specific caselaw holding that the juvenile court must relinquish jurisdiction over all individual offenses that are part of the same case and arise from a common nucleus of operative fact prior to those cases being indicted in the common pleas court. Instead, he points to this court's decision in *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 79, in which we held that "[w]here a defendant harms multiple individuals through the same course of conduct, and each offense charged is defined in terms of conduct toward another, the offenses are of dissimilar import." Appellant uses the holding of *Hubbard* as support for the contention that the juvenile court was required to relinquish jurisdiction over the two offenses relating to Sharpe before he could be indicted for those offenses.

{¶ 23} In response, the state argues that even after change in the statute, courts of appeals have continued to apply the second syllabus paragraph of the Supreme Court's decision in *Adams*, which provides:

> When a minor is transferred from the Juvenile Court to the Court of Common Pleas on a charge which would constitute a felony if committed by an adult, the grand jury is empowered to return any indictment under the facts submitted to it and is

> not confined to returning indictments only on charges originally filed in the Juvenile Court.

*Adams* at paragraph two of the syllabus. The state points to *State v. Barnette*, 7th Dist. No. 02 CA 65, 2004-Ohio-7211, ¶ 33-39, *reversed on other grounds,* 109 Ohio St.3d 313, 2006-Ohio-2109, observing that even following the statutory amendment, Ohio courts continue to apply the holding of paragraph two of the syllabus of *Adams*, and that "[t]he longstanding rule in Ohio is that upon transfer from juvenile court, the grand jury is authorized to return a proper indictment on the facts submitted to it, and is not confined to the charges originally filed in the juvenile court." *See also State v. Weaver*, 6th Dist. No. L-18-1078, 2019-Ohio-2477, ¶ 14 (observing that other districts have determined "that a grand jury has authority to include additional charges in the indictment, arising from the same conduct at issue before the juvenile court * * * [but] may not consider additional charges arising from different conduct or occurrences, absent proper bindover of those crimes from juvenile court" and citing cases).

{¶ 24} *Barnette* addressed a defendant's challenge to his convictions for additional indicted charges that were not transferred, even though all charges were based on the same set of events and did not "involve any additional circumstances beyond those that were under review in the juvenile court." *Id.* at ¶ 38. The *Barnette* court held that "the grand jury was free to indict Appellant on charges arising out of those circumstances, even though the juvenile court did not specifically transfer those charges when it bound the case over to the general division of the court of common pleas." *Id.*

{¶ 25} This approach is sound and is consistent with the general principles and statutory language of R.C. 2152.12(A)(1)(a)(i), providing that the juvenile court "shall transfer *the case*" subject to mandatory bindover if there is probable cause presented. (Emphasis added.) *Compare Cockrell*, 2016-Ohio-5797, at ¶ 15-17 (transferring additional charges arising "from a common nucleus of operative facts as the offenses for which probable cause was found"), and *State v. R.D.*, 10th Dist. No. 13AP-847, 2014-Ohio-5100, ¶ 35-38 (distinguishing *Adams* and holding the General Division lacked jurisdiction to enter a conviction on a case that a juvenile court did not relinquish jurisdiction over, even though it held jurisdiction over a separately-filed case involving different facts but same

juvenile defendant). The important issue regarding transfer is whether "there is probable cause to believe that the child committed the act charged." R.C. 2152.12(A)(1)(a)(i).

{¶ 26} Given the language in *Adams* and *D.W.*, as well as the general limitations on juvenile court jurisdiction, this court must abide by the historic rule that the grand jury can indict for any offenses arising from the same set of facts as the offense that was originally bound over. And here, West's testimony at the bindover hearing that appellant shot both at her and at the car containing Waddell and Sharpe provided sufficient probable cause to conclude that appellant committed that *act* as well as the juvenile court's decision to transfer jurisdiction to the common pleas court over the case flowing from that act. On these facts, the general division had jurisdiction to indict and convict appellant for the attempted murder and felonious assault of Sharpe, as that crime resulted from the same act as the murder of Waddell and the attempted murder of West. Accordingly, appellant's third assignment of error is overruled.

> **Assignment of Error No. 4:** Appellant's rights to a fair trial and to due process as guaranteed by the U.S. and Ohio Constitutions were violated by the admission of hearsay evidence and evidence precluded by Evidence Rule 403.

{¶ 27} Appellant's fourth assignment of error challenges West's statements in the aftermath of the shooting that "David" shot her. He argues the statements are hearsay not falling within any exception, *see* Evid.R. 801(C), and that therefore they should have been excluded.

{¶ 28} We begin by noting that although the assignment of error as worded challenges the statements based on relevancy under Evid.R. 403, the argument thereunder does not address that issue. We must also observe that appellant trial counsel did not object to this testimony at any point, meaning that he has forfeited all but plain error regarding these statements. *See* Crim.R. 52 and *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002) (holding that the plain error doctrine justifies reversal only if: (1) there is error: (2) that is "plain" at the time it was committed: and (3) that affected the defendant's substantial rights and therefore the outcome of the proceeding).

{¶ 29} Under Evid.R. 803(2), a hearsay statement is admissible as an "excited utterance" when it is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The

Supreme Court has long followed a four-part test for statements alleged to be excited utterances. *See, e.g., State v. Taylor*, 66 Ohio St.3d 295, 300-01 (1993). To qualify under the exception there must be: (1) a startling event; and (2) a statement relating to that event; that is (3) made by a declarant with firsthand knowledge; and that is (4) made while under the stress of the excitement caused by the event. *See, e.g., State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 166.

{¶ 30} Appellant argues that West was not "under the stress of the excitement caused by the event" when she made her statements. He challenges West's statements to her grandmother's neighbors, to the responding police, and to the detective who showed her a photo array at the hospital, all on this same basis. He argues that West had driven at least three blocks away from the scene of the crime at the time she first made any statements, and by the time West made statements to her grandmother's neighbors and the responding police, enough time had passed for the stress of the excitement caused by the shooting to dissipate. Appellant also asserts that West's statements that "David" shot her brother cannot be considered an excited utterance, because the shooting of West's brother occurred in May 2017, two months before the shooting for which appellant was on trial.

{¶ 31} These arguments are not persuasive. First, we observe that West's statements made in connection with her identification of Echols at the hospital were made "soon after perceiving the person" under "circumstances [that] demonstrate the reliability of the prior identification," and are therefore deemed "not hearsay" by rule, since West testified and was subject to cross-examination. *See* Evid.R. 801(D)(1)(c). *Compare State v. Nevins*, 171 Ohio App.3d 97, 2007-Ohio-1511, ¶ 28-31. And second, insofar they relate to the claim that "David" shot West's brother, her statements are not hearsay because they were not offered for the truth of the matter asserted but rather for the purpose of identifying who shot West, Waddell, and Sharpe. Evid.R. 801(C).

{¶ 32} But even assuming that West's statements made to witnesses and police officers when they arrived on the scene were excludable hearsay, West and her boyfriend had been shot minutes earlier, she was seriously injured, her boyfriend was dead, and the shooter was at large and likely nearby. "There is no per se amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event

and the statement may not be the result of reflective thought." *Taylor*, 66 Ohio St.3d, at 303. *See also Jones* at ¶ 166.

{¶ 33} The decision to admit or exclude evidence lies in the sound discretion of the trial court. *See, e.g., State v. Sage*, 31 Ohio St.3d 173, 180 (1987). It was well within the court's discretion to allow West's statements as excited utterances. Moreover, as there was no objection to these statements, appellant has failed to demonstrate the court's decision was plain error. Appellant's fourth assignment of error therefore lacks merit and is overruled.

> **Assignment of Error No. 5:** The admission of other-acts testimony and evidence violated Evidence Rules 403 and 404 and appellant's rights to due process and to a fair trial as guaranteed by the United States and Ohio Constitutions.

{¶ 34} Appellant next asserts that West's statements that "David" was the "same man who killed her brother" were improper other-act evidence that should have been excluded under Evid.R. 404(B). The rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

{¶ 35} West testified at trial without objection: (1) that her brother D'ante was killed about two months before she was shot (June 26, 2019 Tr. Vol. II at 592); (2) that she had placed a sticker on the back windshield of her car, which she was driving when she was shot, that said "Rest in Peace, D'ante," *id.*; (3) that she believed "David" had something to do with her brother being killed, *id.* at 595; (4) that she tried to find "David" on Facebook after D'ante was killed and identified him as having listed his name as "RIP Loc," *id.* at 596; (5) when she saw David on the day in question "[h]e said what's up to me, and I said what's up back * * * [and] he started shooting," *id.* at 602-03; (6) that immediately afterward West fled the area and saw her grandmother's neighbor, she told the neighbor that "me and my boyfriend been shot and I felt like I was going to die and if I did could she please tell my

grandmother who did it * * *. I told her David did it," *id.* at 609; and (7) identified "David" in court as being the defendant David Echols. *Id.* at 611. West was then subjected to cross-examination specifically about her claim that appellant shot her brother and admitted: (1) that she did not know appellant's last name, did not know him, and had never been introduced to him, *id.* at 624-26; (2) that she believed that her brother and appellant had been friends but had a falling out, *id.* at 625; (3) that "some guy" told her that appellant was paid to kill her and kill her brother, *id.*; (4) that she did not know why appellant would want to shoot her, *id.* at 627; and (5) that she later identified appellant and his brother James to police officers as being at the crime scene, *id.* at 630.

{¶ 36} Based on the foregoing, West's testimony and statements were relevant and admissible to prove both the issue of appellant's motive to commit the shootings of West, Waddell, and Sharpe, as well as to provide the basis for West's ability to identify appellant as the person who shot her. Evid.R. 404(B). Therefore, appellant's only remaining argument under the assignment of error is that all of West's statements to the effect that "David * * * killed my brother" were used for impermissible purpose of showing that in shooting West, Waddell, and Sharpe, appellant acted in conformity with his bad character.

{¶ 37} The state's closing argument does not mention the killing of D'ante at all. *See* Tr. at 756-79. But D'ante is mentioned in appellant's closing argument, and the defense crafted West's testimony about him into an argument undermining her credibility identifying appellant as the person who shot her:

> There is no reasonable explanation as to what [Echols'] motive would be, how they just happened to all be on Loretta at the same time in the middle of the summer when most people are wearing shorts and tank tops and that kind of stuff, and he's got a great big gun supposedly that he pulls out and starts shooting her. It makes no sense.
>
> The only thing that makes sense is that her brother [D'ante] is dead, she's been told that David killed him, and she needs closure for that.
>
> She's shot. She's upset. She believes that David killed her brother, and that's what she says.
>
> We don't know why. It doesn't make any sense. Here, there is reasonable doubt.

*Id.* at 784.

{¶ 38} The defense, in short, did not object to West's statements because it used them to argue that her basis for identifying appellant as the shooter was an attempt to gain what she believed to be justice for her brother's death. And, at no point during the trial did either party delve into specifics regarding D'ante's death. Rather, it was addressed only in passing, and only in the context of West's identification of appellant as the person who shot her, Waddell, and Sharpe. Given the limited nature and vague substance of West's statements, there was no basis for the trial court to exclude that evidence under Evid.R. 404(B).

{¶ 39} Appellant also contends in passing that one of the officers, during the playing of bodycam video, stated that he matched an alleged Facebook photo of "David" to " 'mugshots' of Echols," and that this reference and another use of the term "mugshots" during the sixteen-minute video footage constituted additional forbidden other-act evidence. But the parties agreed to the video presentation, and no objections were raised to it. Even if playing the unredacted video was somehow erroneous, fleeting references to "mugshots" do not constitute plain error, and given the context presented were undoubtedly harmless. Appellant's fifth assignment of error is overruled.

> **Assignment of Error No. 6:** Appellant was deprived of the effective assistance of trial counsel in violation of appellant's rights under the Sixth and Fourteenth Amendments to the United States Constitution and Section 10 and 16, Article I of the Ohio Constitution.

{¶ 40} In order to obtain a reversal on appeal for ineffective assistance of counsel, a defendant must demonstrate both that defense counsel's performance was deficient, and that counsel's deficient performance prejudiced the defense. *See generally Strickland v. Washington*, 466 U.S. 668, 686 (1984). In assessing claims of counsel's deficiency, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). And in evaluating whether the challenged action caused prejudice, the court must find that

counsel's error was so serious that there is a reasonable probability it affected the outcome of the trial. *See, e.g., State v. Bradley*, 42 Ohio St.3d 136 (1989).

{¶ 41} Appellant asserts several deficiencies with defense counsel's performance. First, he argues that defense counsel failure to challenge a juror; second, he contends that counsel failed to object to West's hearsay and other-acts evidence and that defense counsel's cross-examination of witnesses relating to that evidence was ineffective; third, he asserts that defense counsel failed to object to leading questions and permitted speculative and inadmissible statements from the bodycam video regarding the strength of West's identification of appellant; and finally, he suggests that the cumulative effect of all these deficiencies resulted in him being denied a fair trial.

{¶ 42} Most of appellant's claimed issues recapitulate arguments raised in other assignments of error. As we have observed in discussing his fifth assignment of error, the admission of testimony regarding West's belief that appellant killed her brother was part of a strategy by trial counsel to undermine her identification of appellant as the person who shot West, Waddell, and Sharpe. Similarly, the passing statements in the video regarding the progress of the investigation and identification of appellant, were harmless and did not prejudice appellant's defense, as both West and the officers testified at trial and were subject to cross-examination on these statements, and cross-examination clarifying and highlighting the fact that West was the ultimate source of all of the identification evidence that pointed toward appellant.

{¶ 43} Appellant raises one new issue in this assignment of error, arguing that Juror No. 10 should have been excused for cause. Good cause exists for the removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019 ¶ 94. And where "jurors demonstrate during voir dire that they are able to remain fair and impartial, no action will lie for ineffective assistance of counsel for not seeking their removal." *State v. Bofia*, 3d Dist. No. 07-03-12, 2004-Ohio-3018, ¶ 14. *See also* Crim.R. 24(C)(9) ("no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from the examination of the juror or from other evidence,

that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial.")

{¶ 44} During a break in voir dire, Juror No. 10 indicated to the court bailiff that some of the witness names sounded familiar. As a result, the trial court individually questioned the juror, who indicated he "knew some of the older people by their last names" and he "might know their kids," and that knowing them might affect his ability to serve "because I was close to the ones who came up with me." (June 24, 2019 Tr. Vol. I. at 83-84.) But the juror ultimately confirmed that he did not believe he knew any of the witnesses in this case, and that he believed he could be impartial even if he did know them. *Id.* at 140-41. On questioning from defense counsel, the juror stated that he considered himself to be an "11" on a scale of 1 to 10 regarding open-mindedness. *Id.* at 230. Defense counsel did not question the juror further regarding potential bias. Defense counsel did not challenge Juror No. 10 for cause and passed on the use of counsel's final peremptory challenge. *Id.* at 257.

{¶ 45} Appellant argues that because another juror was excused for cause after she stated she lived in the neighborhood and knew about the crime, knew Waddell's family, and was aware of the alleged perpetrators from social media, *see* Tr. at 248-55, that Juror No. 10 should also have been excused for cause. But neither his answers during voir dire nor his actions during the trial demonstrate anything like the suggestion that Juror No. 10 would not render an impartial verdict, and his general familiarity with the area of the alleged crimes and the families who lived in that neighborhood does not itself demonstrate bias. In fact, if anything, he demonstrated and averred that he was extremely open to persuasion about evidence and the credibility of witnesses. *See, e.g.,* Tr. at 140-47. Given his answers, there is nothing in the record upon which this court concludes it was prejudicial for the juror to remain in the venire, and counsel was not ineffective for failing to seek his removal for cause or by using a peremptory challenge.

{¶ 46} Appellant also suggests that Juror No. 10 may have fallen asleep at points during trial. The state admits that following some testimony with the lights dimmed for photographs, there was a concern voiced by the court that "one of the jurors is like nodding in and out of sleep, and so I wanted to turn the lights on for a moment." *Id.* at 462. The juror was not identified at that time, but on the next day, the following exchange occurred:

MR. SCHOTT: Your Honor, can we approach with the lights on, please?

THE COURT: Sure.

* * *

Thereupon, the following proceedings were held at the bench with the Court and Counsel outside the hearing of open court:

* * *

MR. MANNING: Just so the Juror No. 10 wakes up.

THE COURT: Oh.

MR. MANNING: I just wanted to take a break with the white noise and the lights just to make sure everybody through this testimony is good.

THE COURT: Is it the same one as yesterday?

MS. KAISER: Yes.

MR. SCHOTT: (Inaudible) voir dire. I don't know what happened.

MS. KAISER: My client has noticed every day.

THE COURT: Okay.

MR. SCHOTT: I'll note he was awake for Ms. West's testimony but - -

THE COURT: He's been awake all morning.

MR. SCHOTT: Yeah. So hopefully it's - -

THE COURT: He's good. Thanks.

(June 26, 2019 Tr. Vol. III at 665-66.) Accordingly, there is some equivocal indication that Juror No. 10 may have dozed off on two occasions, but it appears that both trial counsel and the court took steps to address the issue as soon as it was observed.

{¶ 47} On appeal, appellant has not argued that his trial counsel was ineffective for failing to seek a mistrial based on this issue. And given the state of the record, we cannot say that this evidence, on its own, constitutes a sufficient basis for the juror's removal. And certainly, the possibility that Juror #10 dozed off during trial cannot be used as retroactive support for a claim that defense counsel was ineffective for failing to seek Juror No. 10's removal for cause before it even happened.

{¶ 48} Finally, appellant argues that all these instances of alleged deficient performance, when taken together, create a reasonable probability had they not occurred that the outcome of the trial would have been different. As support, he cites *State v. DeMarco*, 31 Ohio St.3d 191 (1987), which recognizes the doctrine of "cumulative harmless error." But to accept his argument, this court would be required to extend *DeMarco*—holding that the cumulative effect of several instances of harmless error is prejudicial is not equivalent to holding that the cumulative effect of several instances of alleged deficient performance create a reasonable probability of a different outcome at trial. Appellant has provided no support for extending *DeMarco* in this fashion. Moreover, he has failed to show that counsel's performance was in fact deficient in any of the ways he asserts, rendering this portion of his argument a nullity.

{¶ 49} Accordingly, appellant's sixth assignment of error lacks merit and is overruled.

> **Assignment of Error No. 7:** The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.

{¶ 50} Appellant's seventh assignment of error asserts that his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence. In addressing sufficiency claims, the Supreme Court held that "[t]he relevant inquiry is

whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, (1991), paragraph two of the syllabus (1991), *following Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). A different analysis is involved when addressing a claim that a conviction is against the manifest weight of the evidence—an appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins*, 78 Ohio St3d 380, 387 at 387.

{¶ 51} Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The factfinder may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964). Therefore, "[w]hen a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins* at 387 (1997), *superseded by constitutional amendment on other grounds*, *quoting Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

{¶ 52} We reject both claims here, as West's testimony and identification alone of appellant provided evidence sufficient to support his conviction as to all of the offenses. Appellant himself has acknowledged that all of the elements of murder, attempted murder, and felonious assault were present in this case—ultimately, he simply challenges his identification by West. But her testimony was sufficient to show his identity, and given the additional testimony of other witnesses, including the neighbors and the police, this is not

a case where the jury lost its way or where the evidence weighed strongly against conviction. Appellant has not shown that his convictions were unsupported by sufficient evidence or were against the manifest weight of the trial evidence. His seventh assignment of error is therefore meritless and is overruled.

> **Assignment of Error No. 8:** The trial court erred and abused its discretion in imposing consecutive sentences on three firearm specifications.

{¶ 53} Appellant admits that given the jury's verdict, the trial court was required to impose sentences for two of the three charged gun specifications and run those sentences consecutively under R.C. 2929.14(B)(1)(g). In this assignment of error, appellant argues that the trial court erred by imposing a sentence for the third gun specification and running that sentence consecutively as well.

{¶ 54} In relevant part, R.C. 2929.14(B)(1)(g) provides:

> [I]f the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section [including firearm specifications as described in section 2941.141, 2941.144, or 2941.145 of the Revised Code] in connection with two or more of the felonies [of conviction], the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

{¶ 55} The statute clearly provides that the sentencing court "*in its discretion*, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications." (Emphasis added.) *Id.* At the sentencing hearing, the state specifically indicated to the trial court "by law only two of [the firearm specifications] must have been run consecutively. The third would have been discretionary." (Aug. 14, 2019 Tr. at 25.) In response, the trial court stated that it had "exercised discretion and determined that consecutive sentences were appropriate for all of those reasons." *Id.*

{¶ 56} Appellant has not provided this court any basis in the record or otherwise to suggest that the trial court's decision was an abuse of discretion; instead, he simply reargues his third assignment of error and contends that the charges arising from the shooting of

Sharpe remain in the exclusive jurisdiction of the juvenile court, adding only that West admitted that she never specifically saw appellant's firearm. But, we are unable to conclude that either of these arguments show an abuse of discretion on the part of the trial court in imposing a consecutive sentence for the third firearm specification. The eighth assignment of error is accordingly overruled.

> **Assignment of Error No. 9:** The imposition of an indefinite prison sentence of 15 years to life for murder violated the Eighth Amendment to the United States Constitution.

{¶ 57} In his ninth and final assignment of error, appellant contends his sentence for murder violates the Eighth Amendment as cruel and unusual punishment as he was 17 at the time of the shooting. But unlike the cases he cites in support of his argument, appellant did not receive a sentence of life without parole. In *State v. Wade*, 10th Dist. No. 19AP-350, 2020-Ohio-5399, interpreting the same cases that appellant cites here, this court affirmed the imposition of an effective life *without* parole sentence upon a defendant who was 16 at the time of the homicides in question:

> *Long, Miller, Montgomery* and *Wade I* do not require sentencing courts to reject life sentences for juvenile offenders convicted of homicide; they simply require trial courts to account for the youth of juveniles as a mitigating factor when sentencing for murder. Here, the trial court specifically stated that it had evaluated the defendant's youth and determined that an effective life without parole sentence of 172 1/2 years to life was appropriate punishment. We do not believe that caselaw required the trial court to do more than that, even if it would be a better practice to do so. Accordingly, we conclude that the trial court did not err in its sentence, and that Wade's rights under the U. S. Constitution and the Ohio Constitution to be free of cruel and unusual punishment were not violated.

*Id.* at ¶ 8. Here, appellant argues that the principles enunciated in *Montgomery v. Louisiana*, 577 U.S. 190 (2016) and *Miller v. Alabama*, 567 U.S. 460, 465 (2012), both of which we reviewed in *Wade,* apply to preclude "automatically" sentencing a juvenile like appellant to 15 years to life with eligibility for parole, and contends that this constitutes plain error under Crim.R. 52(B). But the lack of eligibility for parole is the crux upon which *Montgomery* and *Miller* turn, and by the plain terms of his sentence, appellant is automatically eligible for parole after a period of no more than 30 years. Moreover, when

sentencing appellant, the trial court specifically stated that it was "mindful of *Miller versus Alabama*" and further that "Mr. Echols was 17 when he committed these offenses * * *." (Aug. 14, 2019 Tr. at 20.) Accordingly, appellant cannot demonstrate any error in his sentence, and his ninth assignment of error is overruled.

{¶ 58} For all these reasons, appellant's nine assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

DORRIAN, P.J., and SADLER, J., concur.