[Cite as *State v. Maynard*, 2023-Ohio-4619.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230160 |
| | | TRIAL NOS. 22CRB-16773A, B |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| RUSSELL MAYNARD, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Municipal Court

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal: December 20, 2023

*Emily Smart Woerner*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Chris Konitzer*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Krista Gieske,* Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1} Russell Maynard appeals his convictions, after a bench trial, for unlawfully discharging a weapon within city limits and using weapons while intoxicated. In two assignments of error, Maynard argues that the trial court erred in denying adequate relief in response to the city's multiple discovery infractions in violation of his due-process rights and right to present a defense, and his convictions are not supported by sufficient evidence and are contrary to the manifest weight of the evidence. For the following reasons, we affirm the judgments of the trial court.

### Factual Background

{¶2} On September 26, 2022, Russell Maynard was charged with unlawfully discharging a weapon and discharging a weapon while intoxicated. The charges stemmed from a ShotSpotter alert and the subsequent discovery of a gun, shell casings, and a magazine in Maynard's backyard.

{¶3} At the scheduled bench trial, the city requested a continuance after an off-the-record discussion. Maynard objected noting that he was prepared for trial, and the ShotSpotter representative and police officer were present. The court granted the request, and the case was continued.

{¶4} At the trial, the city's first witness was Officer Jennifer Mitsch. Mitsch testified that she was a lieutenant with the Cincinnati Police Department ("CPD"). When Mitsch was asked about ShotSpotter, Maynard objected because Mitsch was not previously disclosed as a witness. The prosecutor acknowledged that Mitsch had not been disclosed as a witness, and over Maynard's objection, the court continued the trial in progress to allow the city to update its discovery response.

{¶5} On February 6, 2023, the city filed a supplemental discovery response

disclosing Mitsch as a witness and a gun test-fire report that would be provided as soon as it was available. Three days later, the trial resumed. Mitsch testified that she served as the project manager of the ShotSpotter implementation after attending training in California. She participated in training the department in the use of ShotSpotter. Maynard objected to her testimony arguing that Mitsch was testifying as an expert, and the city did not provide an expert report. The court overruled the objection and allowed Mitsch to testify about the police procedure surrounding ShotSpotter and how it works because Maynard did not challenge the reliability of ShotSpotter in a motion to suppress. The state limited its questioning to how the police officers use ShotSpotter information.

{¶6} Mitsch testified that ShotSpotter alerts are communicated via the Computer Aided Dispatch ("CAD") system in the police cruisers. Officers are dispatched to the scene, and a record is created in CAD. Responding officers are required to complete a blotter entry. The alert includes the latitude and longitude location showing where the shot was fired.

{¶7} Officer Brandon Contris, a CPD officer, testified that he responded to the ShotSpotter alert with his partner Officer Grubbs. The alert indicated that the shot was fired in a backyard between two streets, Iliff and Gilsey. They responded to Iliff Ave., and after checking the backyards and finding nothing, they proceeded to Gilsey Ave. As they were driving, they heard a single gunshot in the same area of the alert.

{¶8} While Contris was checking the backyards with his flashlight, he heard Grubbs talking to Maynard. Contris searched Maynard's backyard and found shell casings. He also found a gun under a piece of metal and a magazine with live rounds that fit the gun. The city introduced an evidence bag, and Contris removed the gun

from the bag. Contris testified that he took the gun to the Criminal Investigative Section ("CIS") that night, test fired it to determine if it was operable, and put the gun, the magazine, the live rounds from the magazine, and the shell casings into the evidence bag. A break was taken so defense counsel could inspect the items in the evidence bag. The test-fire report was also in the evidence bag, and the prosecutor provided a copy to Maynard.

{¶9} After the break, Contris was asked whether the gun was operable. Maynard objected, arguing the response would be hearsay, a test-fire report had not been provided in discovery, and any testimony related to the test fire should be excluded. Defense counsel acknowledged that the city's discovery response stated a test-fire report would be provided when it became available, however, a copy of the report should have been provided prior to trial. The prosecutor responded that the report was not made available until the evidence bag was removed from the evidence locker and opened in court.

{¶10} Defense counsel stated that she advised her client that there was no test-fire report, and her understanding was that the city had to produce a test-fire report to prove operability. Without the report, she believed the gun was not operable. Defense counsel further informed the court that if the report was admitted she would be rendered ineffective. The court informed defense counsel that if the report constituted surprise, Maynard could have a continuance. The discussion continued in chambers.

{¶11} During the in-chambers discussion, the trial court expressed its frustrations with the ongoing discovery issues, the prosecutor's inexperience, and defense counsel's failure to notify the court that the report had not been provided.

4

Unwilling to proceed with the trial, the court directed the prosecutor to seek assistance. The court informed defense counsel that if the report was a surprise, the court could either suppress the report or grant a continuance to the defense, but defense counsel did not want a continuance. A supervising prosecutor arrived and informed the court that the test-fire report merely documented the officer's test fire of the gun, and that the officer's testimony alone could establish operability.

{¶12} The parties returned to court, and the judge noted the objection to the report, the officer's testimony that he test fired the gun, and defense counsel's position that she would have reformulated the theory of defense if she had had the report. The court continued the trial in progress.

{¶13} When the trial resumed, Contris continued his testimony. Contris testified that when he and his partner heard the gunshot, they asked for more officers to respond. They drove to 1272 Gilsey Ave., and Contris checked the side of the house while Grubbs went to the driveway and spoke with Maynard. Grubbs had observed Maynard walk from the backyard to the driveway.

{¶14} At this point, Officer Meece had arrived, so Grubbs and Contris searched the backyard while Meece stayed with Maynard. Contris found a gun, a .22-caliber KelTec semiautomatic pistol, under some building debris. Contris also found a magazine that fit the gun with 12 live rounds. Contris took the gun to the CIS location and test-fired the gun. The gun was operable and in proper working order. The test-fire report was admitted without objection. The report reflected that five cartridges were found in Maynard's pocket, and five spent casings were found on the ground in the backyard. Contris testified that when the rounds in the magazine are the wrong way, the gun's ability to fire is not impacted. The gun was still operable and could fire.

{¶15} On cross-examination, Contris testified that the gunshot he heard was not captured on his body-worn camera. He further testified that the bullets in the magazine were not parallel, but the gun was still operable. Contris did not see Maynard holding the gun, and he did not do a gunshot-residue analysis. On redirect, Contris explained that he heard the gunshot before he had activated his body camera. When he heard the gunshot, he activated his camera.

{¶16} Officer Kevin Grubbs testified that he responded to the ShotSpotter alert with Contris. Grubbs confirmed that he also heard a gunshot which prompted them to request more officers. They first responded to Iliff and did not locate anything. Grubbs spoke with a neighbor on Iliff who had also heard the gunshots. All of the yards were fenced in, so they had to drive to Gilsey to access the backyards of the homes on Gilsey.

{¶17} Grubbs approached Maynard in his side yard as Maynard emerged from the backyard and asked him about the gunshots. Maynard pointed to the other side of the fence and said that it was his gun. Maynard also volunteered that he had been drinking. When Grubbs was speaking with Maynard, he observed that Maynard had slurred and slow speech and watery eyes. Maynard was slow to process information. Grubbs did not notice an odor of alcohol.

{¶18} CPD Officer Matthew Shideler testified that he observed Officer Meece searching Maynard. Maynard told Meece that he had bullets in his pocket and was trying to get the gun unjammed. Shideler read Maynard his *Miranda* rights, and Maynard agreed to answer questions. Maynard said he was firing the gun at the ground to fix the spring. Maynard admitted that firing it was stupid. Shideler testified that Maynard seemed moderately intoxicated because he had glassy eyes and slurred

speech. He also admitted to drinking two beers and said he did not finish the second beer. Shideler testified that he did not perform any field-sobriety testing or offer Maynard a blood, urine, or breath test.

{¶19} The city's final witness was CPD Officer Casey Meece. Meece testified that Maynard had glassy, watery eyes, was slurring his speech, and was delayed in his reactions to Grubbs's commands. When Meece was trying to identify Maynard, he smelled a mild-to-medium odor of alcohol on Maynard's breath and person. Maynard told him that the gun was his and registered in his name. Maynard also told him that he had ammunition in his pocket, so Meece removed the cartridges from his pocket. Meece testified that he was 100 percent positive that Maynard was under the influence.

{¶20} The trial court rendered guilty verdicts after finding the officers' testimony to be credible and noting Maynard's admissions regarding the firearm and alcohol consumption. This appeal followed.

### Discovery Violations

{¶21} In his first assignment of error, Maynard argues that the trial court abused its discretion by failing to impose adequate sanctions for the city's discovery violations. He asserts that the court should have precluded Mitsch from testifying at trial, excluded all evidence related to the test fire of the gun, and dismissed the charges as a sanction for the violations.

{¶22} A trial court has broad discretion to regulate the discovery process and impose sanctions for violations. *See State v. Wiles*, 59 Ohio St.3d 71, 78, 571 N.E.2d 97 (1991). If a party fails to comply with the discovery rules, the trial court may "grant a continuance, or prohibit the party from introducing in evidence the material not

disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(L). We review a trial court's sanctions for discovery violations for an abuse of discretion. *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986, N.E.2d 971, ¶ 20. A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶23} The purpose of Crim.R. 16 "is to prevent surprise and the secreting of evidence favorable to one party. The overall purpose is to produce a fair trial." *State v. Palme*r, 112 Ohio St.3d 457, 2007-Ohio-374, 860 N.E.2d 1011, ¶ 18. When a discovery violation is committed, a trial court must review the circumstances surrounding the violation, balance the competing interests, and "must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Lakewood v. Papadelis*, 32 Ohio St.3d 1, 511 N.E.2d 1138 (1987), paragraph two of the syllabus. In determining an appropriate sanction, the court considers: (1) whether the failure to disclose was a willful violation of Crim.R. 16, (2) whether foreknowledge of the undisclosed material would have benefited the accused in the preparation of a defense, and (3) whether the accused was prejudiced. *Darmond* at ¶ 35.

{¶24} It is undisputed that the city did not disclose, prior to trial, that Mitsch would be called as a witness and that the failure to disclose was neglectful. Maynard argues that he would have benefited by the knowledge that ShotSpotter evidence would be introduced at trial and prejudiced by the testimony that the ShotSpotter alert included the coordinates of the location of the shots.

{¶25} However, Maynard was aware that the city intended to have a ShotSpotter witness testify. At the second trial setting, where the city sought a

continuance, Maynard objected to the continuance noting that the ShotSpotter witness was present. Maynard was also aware that ShotSpotter testimony would be elicited because the initial discovery response included a ShotSpotter report and the complaint stated that the unlawful discharge of a weapon was based on "ShotSpotter response in area and gun located in area." Finally, Maynard was not prejudiced by the testimony because Contris testified that the ShotSpotter alert indicated that the shot was fired in a backyard between Iliff and Gilsey Avenues.

{¶26} Next Maynard contends that all evidence related to the test fire of the gun should have been excluded because the omission of the test-fire report was willful, prior knowledge of the test-fire report would have influenced the decision to try the case, and he was prejudiced because the defense was under the impression that the city could not prove operability, and the report constituted an unfair surprise. Maynard further argues that Contris's testimony should have been excluded as "unfair surprise to the defense."

{¶27} Maynard's argument that he was surprised and prejudiced by Contris's testimony lacks merit. As the court found, Maynard knew operability was an element the city was required to prove. "[T]he fact that the offenses involved a weapon should have put [defendant] on notice that the state would present evidence regarding the operability of the firearms." *State v. Miller*, 12th Dist. Preble No. CA2002-02-004, 2002-Ohio-6109, ¶ 12. Moreover, Contris was disclosed as a witness in the state's first discovery response, and his testimony as to the operability of the gun cannot be characterized as unfair surprise. "Operability of a firearm may be established by an operability report or testimony of a witness who had test-fired the weapon, but it also may be established by circumstantial evidence." *State v. Pope*, 1st Dist. Hamilton No.

9

C-180587, 2019-Ohio-3599, ¶ 7. Even if the test-fire report should have been excluded, Maynard's substantial rights were not affected by the admission of the report because Contris testified that he test fired the gun, and it was operable.

**{¶28}** Based on this record, we cannot conclude that the trial court abused its discretion by granting continuances as sanctions for the discovery violations and concluding that the dismissal of the charges was unwarranted. Accordingly, we overrule the first assignment of error.

### Sufficiency and Manifest Weight

**{¶29}** Next, Maynard contends that his convictions were not supported by sufficient evidence and were contrary to the manifest weight of the evidence.

**{¶30}** In reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime had been proved beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶31}** As to the weight of the evidence, "an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Glover*, 1st Dist. Hamilton No. C-180572, 2019-Ohio-5211, ¶ 29, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We afford substantial deference to credibility determinations because the factfinder sees and hears the witnesses. *See Glover* at ¶ 30.

**{¶32}** Maynard was convicted of unlawfully discharging a firearm within city

limits in violation of Cincinnati Municipal Code 708.27 which required the city to prove the gun was operable. Maynard argues that the city failed to prove that the gun was operable because the rounds were "jammed up inside the magazine."

**{¶33}** Under the ordinance, a firearm is defined in R.C. 2923.11. Cincinnati Municipal Code 708.1-B. R.C. 2923.11(B)(1) defines firearm as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." "The requirement that a gun be either operable or readily capable of being rendered operable is meant to distinguish irretrievably broken guns from guns that are either fully functioning or temporarily non-functioning." *State v. Stubblefield*, 8th Dist. Cuyahoga No. 90687, 2008-Ohio-5348, ¶ 9. A jammed gun that is temporarily nonoperational is capable of being readily rendered operable because the jam can be cleared. *Id.*

**{¶34}** The evidence established that ShotSpotter detected a gunshot in the area of Maynard's house, between Iliff and Gilsey Aves. While driving to Gilsey, Contris and Grubbs heard a gunshot. Grubbs saw Maynard leave his backyard and walk into the side yard. Shortly thereafter, Contris found a gun in Maynard's backyard. A magazine and spent casings were found in the backyard and five cartridges were found in Maynard's pocket. Maynard admitted that he had been firing the gun into the ground while trying to fix the spring.

**{¶35}** Although Contris testified that the rounds in the magazine were askew and inserted the wrong way, he also testified that the gun's ability to fire was not impacted. The gun could still fire, and when he test fired the gun, it was operable.

**{¶36}** Viewing the evidence in the light most favorable to the state, there was

sufficient, competent, and credible evidence that the gun was operable. This is not an exceptional case in which the evidence weighs heavily against the conviction.

{¶37} Maynard also contends that the city failed to prove that Maynard was using the gun while intoxicated. Maynard was convicted of violating R.C. 2923.15(A), which provides, "No person, while under the influence of alcohol or any drug of abuse, shall carry or use any firearm or dangerous ordnance."

{¶38} "[T]he word 'intoxicated' as used in R.C. 2923.15(B) means the state of being 'under the influence' [as used] in R.C. 2923.15(A)." *State v. Weber*, 12th Dist. Clermont No. CA2018-06-040, 2019-Ohio-916, ¶ 13, quoting *State v. Smith*, 9th Dist. Wayne No. 1610, 1979 Ohio App. LEXIS 11527, 2-3 (Dec. 12, 1979).

> 'Under the influence' has been defined as the condition in which a person finds himself after having consumed some intoxicating beverage, whether mild or potent, and in such quantity, whether small or great, that its effect on the person adversely affects his actions, reactions, conduct, movements or mental processes or impairs his reactions to an appreciable degree, under the circumstances then existing so as to deprive him of that clearness of the intellect and control of himself which he would otherwise possess.

*State v. Eldridge*, 12th Dist. Warren No. CA2015-02-013, 2015-Ohio-3524, ¶ 7.

{¶39} Evidence that the accused admitted to consuming a glass of wine, had glassy, bloodshot eyes, and a strong odor of alcohol is sufficient to establish intoxication. *See id*. at ¶ 9-13. The testimony of witnesses that the accused was intoxicated based on their observations that he was "staggering and swaying, he had a moderate to strong odor of alcohol, and his speech was slurred" has been found

sufficient to prove intoxication. *See State v. Dickens*, 2d Dist. Montgomery No. 17336, 1999 Ohio App. LEXIS 1649, 5, (April 9, 1999).

{¶40} Here, Grubbs testified that he observed that Maynard had slurred and slow speech and watery eyes and was slow to process information. Grubbs believed that Maynard was intoxicated. Meece testified that Maynard had glassy, watery eyes, was slurring his speech, and was delayed in his reactions to Grubbs's commands. Meece detected a mild-to-medium odor of alcohol on Maynard's breath and person. Meece further testified that he was 100 percent positive that Maynard was under the influence. Shideler testified that Maynard seemed moderately intoxicated based on his observations and Maynard's admission that he was consuming alcohol that evening.

{¶41} The state presented sufficient evidence that Maynard was intoxicated. We cannot say that the trial court clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial.

{¶42} We overrule the second assignment of error.

## Conclusion

{¶43} Having overruled Maynard's two assignments of error, we affirm the judgments of the trial court.

Judgments affirmed.

**BOCK** and **KINSLEY, JJ.,** concur.

Please note:
The court has recorded its own entry this date.