[Cite as *State v. Mosley*, 2025-Ohio-4448.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. | C-240574 |
| | | | C-240575 |
| Plaintiff-Appellee, | : | TRIAL NOS. | B-2203078 |
| | | | B-2305890 |
| vs. | : | | |
| CHARLES MOSLEY, | : | | |
| Defendant-Appellant. | : | *JUDGMENT ENTRY* | |

This cause was heard upon the appeals, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are affirmed.

Further, the court holds that there were reasonable grounds for these appeals, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 9/24/2025 per order of the court.**

**By:**_____
        **Administrative Judge**

[Cite as *State v. Mosley*, 2025-Ohio-4448.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. | C-240574 |
| | | | C-240575 |
| Plaintiff-Appellee, | : | TRIAL NOS. | B-2203078 |
| | | | B-2305890 |
| vs. | : | | |
| | | *O P I N I O N* | |
| CHARLES MOSLEY, | : | | |
| Defendant-Appellant. | : | | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: September 24, 2025

*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**Z**AYAS**, Presiding Judge.**

{¶1} Charles Mosley appeals his convictions for two counts of rape, conspiracy to commit murder, and intimidation of a witness or victim. In five assignments of error, Mosley contends the evidence was insufficient to support the convictions, his convictions were against the weight of the evidence, his trial counsel was ineffective for failing to object to the consolidation of the charges for trial, the trial court erred by admitting a 911 call, and the record did not support the imposition of consecutive sentences. For the following reasons, we affirm the judgments of the trial court.

## Factual Background

{¶2} On July 20, 2022, Mosley was indicted for two counts of rape, two counts of felonious assault, and one count of aggravated menacing under the case numbered B-2203078. The victim of the charges was his former girlfriend, L.H. Mosley pled guilty to one count of felonious assault, and the State dismissed the other felonious-assault charge and the aggravated-menacing charge. While awaiting trial on the rape charges, Mosley was indicted on additional charges involving L.H, including attempted murder, conspiracy to commit murder, and intimidation of a witness or victim in the case numbered B-2305890. The cases were consolidated for trial with no objection from Mosley.

{¶3} The first witness was an officer from the Reading Police Department who was dispatched to a residence around 3:00 a.m. for a felonious assault. When he arrived, he found L.H. sitting in a vehicle with multiple, severe injuries to her face. L.H. told him that she was having drinks with Mosley when the two started fighting. Mosley began beating her, hitting her in the face, and sticking his hands down her throat. Mosley then dragged her into the bedroom and raped her. L.H. was taken to

3

the hospital.

**{¶4}** An Amberly Village canine police officer testified that she was called to assist with a search warrant being served in Reading. The canine officer brought her dog to search the apartment. When the dog was clearing the bedroom, it jumped on the bed and discovered Mosley asleep under the covers. The canine officer testified that the apartment was a mess with things scattered everywhere and tipped over. She saw blood and blood-stained clothing on the floor when she entered the apartment.

**{¶5}** After the canine officer's testimony, the court recessed and addressed a discovery issue which had arisen. That morning, the prosecutor located a 911 call made by L.H. that the State previously did not know existed. The prosecutor acknowledged that the call had not been provided to the defense and explained that the former prosecutor on the case had been fired. He immediately provided a copy to defense counsel. The prosecutor requested that the court admit the call "given its relevancy."

**{¶6}** Although having no issue with the current prosecutor, defense counsel explained that he was told a 911 call did not exist. Counsel then requested the 911 call be excluded from evidence as a discovery violation.

**{¶7}** The prosecutor argued that exclusion would be the most severe sanction, and instead, requested that the court grant defense counsel a continuance to review the five-minute call. Defense counsel requested additional time to listen to the call and possibly get a transcript because, "It's an important piece of evidence as it relates to the cross-examination of several of the upcoming witnesses." If the court agreed, counsel was fine to proceed in that manner.

**{¶8}** The court admitted the call after finding that the violation was not willful and appeared to be inadvertent. The court further found that the 911 call merely

corroborated events, and L.H. would testify. As a sanction, the court said it would allow the defense "very wide latitude on cross-examination" and a continuance if necessary. Mosley objected for the record.

**{¶9}** L.H. testified that she had started dating Mosley in 2016, and he moved in with her that year. They broke up in 2020 after they purchased a BMW. Mosley became a different person coming home late at night and telling her to leave. After L.H. moved out, she was unable to retrieve all of her belongings from him. Mosley had her brother's motorcycle, and when her brother went to get it, Mosley refused to give it to him. L.H. and Mosley had remained friends, and occasionally went out, but the last time they had had sexual relations was February of 2022. By May, L.H. had stopped talking to him and responding to his texts.

**{¶10}** When L.H. was leaving work, Mosley called her, and she told him that she did not want to speak with him. Later, Mosley texted her and said he was bringing her the motorcycle and a pool stick that belonged to her. L.H. told Mosley not to come to her home, but he said he was on his way and texted her a photo of the motorcycle on the back seat of the car. When Mosley arrived, he wanted her to go to the liquor store with him.

**{¶11}** The two went to a liquor store, and L.H. poured both of them a drink of Jack Daniels. Mosley quickly finished his and requested another, but she refused because he was driving too fast. They went back to her house around 11:00 p.m. While listening to music, Mosley asked her if they were going to get back together twice, and she told him, "No." Then he started mumbling "WDTGS." When L.H. asked what that meant, Mosley responded, "We die together soon." Immediately, L.H. told him to leave. When Mosley stood up, L.H. saw a knife sticking out of the back of his pants. Mosley told her that she was going to die tonight and approached her with the knife.

They wrestled, and L.H. got the knife and threw it to the other side of the room.

{¶12} When L.H. began hollering to get her neighbor's attention, Mosley put his fingers in her mouth. L.H. was unable to bite him because her top teeth had been removed for dentures. She tried to call 911, but he took her phone and threw it. Mosley threw her into the china cabinet. They fell to the floor, and Mosley tried to choke and strangle her. Mosley told her, "After I kill you, I'm gonna fuck your dead body." He pulled her pants down, placed his penis into her vagina, and raped her. L.H. tried to fight him, but after a while, she was too tired and told him to hurry up and kill her.

{¶13} L.H. suggested going into the bedroom, hoping Mosley would fall asleep. Mosley had oral sex with her, and inserted his penis into her vagina. Mosley licked her body, saying he would leave his DNA all over her dead body. During the encounter, Mosley repeatedly threatened to burn her apartment down and shoot her and then kill himself.

{¶14} Eventually, he fell asleep, so L.H. grabbed her jacket, keys, and phone and went into her car and called 911. L.H. drove across the street because Mosley had told her he had a gun in his car and was going to shoot himself after he killed her.

{¶15} During the assault, L.H. had lost a tooth and sustained injuries over her entire body. Her hair was drenched in blood, and her face was bloody. L.H. identified her injuries from photos that her sister had taken at the hospital. L.H. had bruising on her face, injuries to her forehead, red eyes, and swollen lips. One of her bottom teeth was missing. Her arm was bruised and cut from the knife.

{¶16} L.H. identified Mosley's knife. Over objection, the State played the 911 call, and L.H. confirmed it was her voice. L.H. had driven to the apartment building across the street and began honking her horn when she saw the Reading police vehicle. The State also introduced three videos from L.H.'s ring camera. The first one showed

Mosley standing by his BMW at 11:45 p.m. The second video captured Mosley's and L.H.'s voices at 1:00 a.m. The third video was recorded four minutes later, and Mosley said that L.H. was going to die by his hand.

{¶17} On the night in question, Mosley had had several drinks, but L.H. suspected he was on drugs. L.H. testified that she did not have consensual sexual relations with him.

{¶18} After reporting the attack and later receiving messages from the FBI and the Reading police, L.H. learned the police would be watching her home, and she saw them around her house.

{¶19} On cross-examination, L.H. testified that she had met Mosley at the Elks Lodge in Madisonville in 2015. They began dating three months later and maintained a friendship after they broke up. The two texted and spoke on the phone. In 2022, L.H. played pool with Mosley three times, and on two of those occasions, they had sexual relations. L.H. dined with Mosley on a few occasions because he wanted to see her granddaughter.

{¶20} L.H. was cross-examined about an interview with a police detective on June 20, 2022. L.H. was confronted about several alleged inconsistencies between the statements in her police interview and her in-court testimony. During the interview, L.H. explained that at some point during the assault, she was too tired to fight, but then something told her to find a way to escape. A picture of her deceased mother with her church group had fallen on the floor and was next to L.H. while she was being raped. When L.H. looked at the photo, she gathered the strength to find a way to stay alive. L.H. had told the detective she almost gave up during the assault, but at trial, she testified it was during the rape. L.H. explained that both happened at the same time.

7

**{¶21}** L.H. denied telling the responding Reading officer that Mosley dragged her into the bedroom. At the time, L.H. was distraught, and all she could remember was the officer asking if she had been burned. L.H. remembered telling someone about Mosley's gun in his car, but she could not remember who. L.H. was questioned about why she did not mention Mosley's threat to burn down her apartment. L.H. replied, "I didn't think that the whole conversation that he was giving me while he was trying to kill me was relevant to put in everything."

**{¶22}** Defense counsel confronted L.H. about the differences between her statements on the 911 call, to the responding Reading officer, to the detective who interviewed her, and in her petition for a civil protection order. L.H. explained that the 911 call was a distress call. But her statement to the detective occurred nine days later when she was much calmer, and when she sought the protection order, she was accompanied by a woman from Women Helping Women.

**{¶23}** L.H. testified that she was trying to do anything to get Mosley off of her and could not remember every detail of the attack because she was just trying to survive. L.H. further explained that she remembered what had happened, but not necessarily in the correct order due to the distress and difficulty of the night

**{¶24}** The next witness was a police officer from Springfield Township who had worked as a Reading officer two years prior. He responded to L.H.'s apartment to assist with the execution of the search warrant. The officer authenticated 13 photos of the apartment, including photos of the knife, bloody pants and clothing, a bloody towel, and a wallet with Mosley's driver's license that were in the living room. Some of the photos were a bit blurry because the camera was not working properly. The officer searched Mosley's vehicle and did not recover a gun.

**{¶25}** A forensic biologist from the Hamilton County Coroner's Office Crime

Lab testified that she analyzed the swabs taken from L.H. and Mosley. No sperm was identified on the vaginal swab. L.H.'s oral swab indicated blood but no semen. The fingernail swabs indicated blood. The right and left labia majora swabs indicated amylase, an enzyme in saliva, and the right labia majora swab also indicated blood. The perineum swab had no semen or blood. The left nipple swab had amylase. The left neck swab had blood and amylase, and the right neck swab had amylase. Blood was indicated on the underwear. The analyst got a partial DNA profile from the right labia majora swabs that were a mixture of DNA from at least two people. L.H. was the major profile and the minor profile had insufficient DNA to test. The major DNA profile from the left nipple matched Mosley. None of the other swabs had enough DNA to test.

{¶26} The lead detective on the case, formerly a Reading detective, testified that she entered the apartment between 5:30 and 6:00 a.m. Furniture and tables and other stuff had been knocked over. There was blood and a knife on the floor. The lead detective took the photos, but the camera was malfunctioning. She interviewed Mosley, and the recording was played for the jury. Mosley seemed very confused. Mosley said he did not know what happened that night, but he denied assaulting L.H. and insisted that he did not rape her. Mosley said the sex "must have been consensual." The lead detective attempted to interview L.H. on the night of the incident, but L.H. was in and out of consciousness at the hospital.

{¶27} On cross-examination, the lead detective confirmed that no gun was found in Mosley's car or home, and that Mosley willingly gave a DNA sample. She also testified that L.H. told her that she almost gave up trying to escape during the assault and the rape.

{¶28} After Mosely had been arrested, a Hamilton County Sheriff's Office

("HCSO") detective testified that she was notified by an FBI agent that a possible murder-for-hire was being planned in the jail. The detective met with the agent and learned that Mosley was the suspect. Next, she met with an inmate who was in the same cell with Mosley. The detective instructed the inmate to allow Mosley to approach him, and she placed a recording device in his pocket. The inmate recorded Mosley from November 4 through 11.

{¶29} The State requested to play excerpts of the recordings. Mosley objected and stated the recording should be played in its entirety. The trial court determined that most of the recordings were irrelevant, so each party could decide which portions to play. The first clip was the meeting with the inmate. A detective told the inmate not to lead Mosley. The police put money on the inmate's phone so he could call them or make calls for Mosley, especially if Mosley tried to arrange a payment to the inmate to kill L.H.

{¶30} The inmate was admitted to the jail on October 24, and the FBI agent alerted the HCSO detective to the plot one week later. The following day, the HCSO detective met with the inmate. The inmate had worked as a confidential informant for several law enforcement agencies and officers for 20 years. The HCSO detective made no promises to the inmate, but informed him that the prosecutor might give him case consideration. The inmate explained how he collected information after being placed in the cell, and how to put "money on the books." Mosley had tried to hire the inmate to kill his ex-girlfriend.

{¶31} The inmate admitted to being a "professional snitch" and testified that he met Mosley in the jail when he was moved into Mosley's cell. After the inmate purchased and shared food with Mosley, Mosley informed him that he was in jail for domestic violence. The inmate did not believe him because Mosley had been

incarcerated too long for a domestic-violence charge. Eventually Mosley admitted he was charged with felonious assault but never mentioned the rape charges. Mosley kept saying, "I need to get her gone. I want her gone, gone. I want her dead." Mosley mentioned a grandbaby or grandniece and did not care if the grandbaby or grandniece were killed too. The inmate said he could do the murder if he got out, and Mosley was going to pay him in part with the BMW.

{¶32} After a week of Mosley saying he wanted her killed and offering to pay him, the inmate knew Mosley was serious, so he called an FBI agent. The inmate did it because his brother was murdered in 2010, and the people who did it were never caught. Now he "snitches" on anyone who wants to kill another person. The sheriff's detectives met with him after he called the FBI agent and provided him with a recording device. The inmate was instructed not to mention the murder-for-hire, and to let Mosley bring it up. The State played a brief portion of a recording, and the inmate identified the voices. Mosley was talking about getting money to pay a hitman. The inmate had made up a guy who would kill L.H. when he got money. The inmate tried to talk Mosley out of killing L.H., but he was adamant. The inmate testified that Mosley said things like, "you know, I want her dead. I want the family dead. I want -- like I said, I don't know if his grandbaby or the grandniece -- Nugget dead. You know, he just -- he was in -- he had a lot of rage in him. He had a lot of rage and anger in him behind being incarcerated behind this woman."

{¶33} Mosley told the inmate that he had lived with L.H. in a relationship, and she was wrong and should not have done this. Mosley said, "They coulda talked it out. They coulda worked it out." Mosley was intoxicated the night it happened and said he was sorry, but never denied the rape. Another recording was played where the two discussed getting money to the inmate's wife so she could pay the hitman. The inmate

11

never spoke with his wife; he was actually speaking to the detective. The inmate could not remember when the plan evolved to have him kill L.H. On the next recording, Mosley said he was going to kill Women Helping Women. Mosley was perturbed that they were helping L.H. pursue charges against him, and he wanted everyone involved dead. The inmate told him to focus on the first one.

{¶34} On the next recording, they talked about getting the inmate some "tools." "Tools" was the code word for guns, and Mosley said his brother-in-law had some of his tools that he was going to sell for money for the down payment. Mosley was going to pay the inmate more after his release and promised to give the inmate the BMW and a motorcycle. On the next recording they discussed "stacks." "Stacks" refers to $1,000. Someone had deposited money into Mosley's jail account or "books" to pay the inmate's wife, and a check was to be mailed to her. The State presented a check for $100 from Mosley to the inmate's wife. The check was in an envelope addressed to the inmate's wife. Mosley and the inmate discussed the hit, and Mosley gave the inmate the schematics of where L.H. lived, directions to her home, and the best way to access the house. Mosley told him about the ring camera, times when L.H. left for work, where she parked, what door she would use, and what vehicle she drove. Mosley sketched it on a piece of paper. The map Mosley drew was introduced into evidence. The inmate gave Mosley multiple opportunities to withdraw the hit, but Mosley wanted her dead.

{¶35} On cross-examination, the inmate recited his criminal history which included a felony in 1992, a felony in Butler County, and an extensive misdemeanor history. The inmate had been in prison twice and had worked as a confidential informant ("CI") for the FBI, HCSO, and the Cincinnati Police. When he had information, he contacted law enforcement. Before his brother was murdered, the

inmate snitched on people involved with drugs. When the inmate became an informant in 2006, he had been charged with assault, obstructing, and tampering with evidence. After his 2006 release, the inmate hired an attorney and contacted the FBI about large quantities of drugs being transported into Hamilton County. The inmate had received case consideration in the past in exchange for the information he provided to law enforcement. In this case, the inmate was released on bond to make it appear as if he were going to murder L.H.

**{¶36}** Next, the jail office manager of accounts testified that he handled all deposits and withdrawals from the inmates' accounts. The manager was asked to intercept any checks sent by Mosley, and authenticated a resident-activity report from Mosley's account from October 3 through November 7. Cash was deposited on November 7, and the manager intercepted a withdrawal check that week from Mosley. The manager printed the check, and the detectives took it from his office. Mosley had completed a withdrawal request form and opted to have the check mailed. The check was written to the inmate's wife from Mosley's account on November 8. Mosley identified the wife as his "niece." Usually, inmates purchased an envelope from the commissary and sent it with the withdrawal request, indicating where they wanted the check mailed.

**{¶37}** The State rested, and Mosley testified on his own behalf. Mosely, who was 61 years old, went to Withrow High School and joined the army after high school. He received an honorable discharge and then became a plumber. Mosley had four daughters and nine grandchildren. Mosley explained that he had pled guilty to the felonious assault because he was guilty. He testified that he did not plead to rape or conspiracy to murder because he did not commit those crimes. Mosley confirmed he started dating L.H. after meeting her at the Elks Lodge in 2014. L.H. ended the

relationship and moved out of their home while Mosley was out of town. Mosley blamed the BMW for the ending of the relationship.

{¶38} A few weeks after the break up, Mosley and L.H. met for dinner with L.H.'s granddaughter Nugget, and they continued to talk. Occasionally, they would get a hotel room, drink, and have sex. On Saturdays, they would have dinner with Nugget, and they would shoot pool on Wednesdays. Mosley was permitted to pick up Nugget from dance and take her to eat. Mosley was happy to spend time with L.H., but he missed her.

{¶39} Mosley testified that on June 10, they spoke on the phone and L.H. said that if he really wanted to rekindle the relationship, he would bring her the motorcycle and the pool stick. Mosley brought the items to her home, and they went to get a bottle of Jack Daniels. Mosley authenticated photos from the ring camera showing his arrival and entrance into her home at 10:22 p.m. Mosley was shown a photo of the two of them leaving at 10:45 to get the liquor. At 11:26 p.m., they returned. L.H. had a drink of Jack Daniels in her hand, and Mosley had a beer and the fifth of Jack Daniels. At 11:44, he went outside to smoke a cigarette.

{¶40} Mosley and L.H. were listening to music, drinking, and having consensual sex. The sex lasted about 20-25 minutes. Then they had an argument because his car payment was late, and L.H. had cosigned the loan, and she was mad they were not going to Tennessee for her brother's birthday. During the fight, Mosley said L.H. was going to "fuck around and make [him] slap her." According to Mosley, L.H. responded, "Yeah, go ahead. I'll tell the police you raped me."

{¶41} Then, Mosley snapped, grabbed L.H. by the mouth, and placed his fingers in her mouth and "had her by the bottom of the chin." Mosley told her he was going to kill her and they would die that night. Mosley confirmed the statements were

audible on the ring video. Mosley told L.H. that she was the only "bitch" he ever loved, and she was going to ruin his life. He repeatedly said he was going to kill her and then himself. Mosley justified his actions because he was angry that she would accuse him of rape. After arguing for ten minutes, Mosley went to sleep.

{¶42} Mosley testified that L.H. woke him up and said, "Let's go get in the bed." The next thing he remembered was waking up to a police dog and the police. Mosley was taken to the Reading Police Department and met with the female detective. Mosley signed a *Miranda* waiver and admitted that he lied to the detective about the assault because he was scared. When the detective told him that L.H. had accused him of rape, Mosley was shocked. Mosley volunteered to provide a DNA sample and consented to the search of his car because he did not own any guns.

{¶43} Mosley met the inmate after he pled guilty to the felonious assault. At that time, Mosley explained that he was hurt, embarrassed, and depressed because he had been wrong to assault L.H. While he was incarcerated, Mosley slipped while getting out of the shower, and had trauma to his C-5 and C-4 vertebrae and nerve numbness. The doctors diagnosed a tumor in the center of his back, which was surgically removed. Mosley was prescribed pain-killers and muscle relaxers. Mosley testified that the inmate suggested that he kill L.H., and given his current state of mind, Mosley thought it was a good idea. Mosley further testified that he sent the inmate's wife $100 to pay her rent and identified her as his "niece" because inmates may only send money to family.

{¶44} Mosley admitted that he had said awful things on the jail recordings, but he was in a different state of mind at the time. Mosley admitted that he said he wanted to kill L.H., but did not mean it.

{¶45} On cross-examination, Mosley was confronted with the numerous

15

recorded statements where he discussed paying for L.H.'s murder. Mosley admitted that he gave specific instructions on L.H.'s locations because he wanted L.H dead. Mosley admitted that he told the inmate to kill L.H. and drew him a map. However, Mosley claimed the entire scheme was the inmate's plan. When the prosecutor asked if Mosley was claiming entrapment, he stated that the inmate put the idea to kill her in his head.

{¶46} Mosley admitted to threatening L.H.'s granddaughter Nugget, and explained that his rationale was that if he were incarcerated and unable to see his grandchildren, then he wanted L.H.'s granddaughter dead. Mosley agreed that he never mentioned sending the inmate's wife money for rent on the recordings.

{¶47} Mosley testified that he did not black out that night, but he just fell asleep on the floor on top of L.H. after he badly beat her. L.H. woke him up and said the floor was uncomfortable and they should go to bed. Mosley testified that he wanted to kill L.H. that night. Mosley identified the knife as his and said he kept it in his car. Mosley did not know how it got into the apartment that night. He claimed that L.H. planted the knife, and that the knife was very dull.

{¶48} After Mosley's testimony, the defense rested. The jury convicted Mosley of all the charges. Mosley was sentenced to 11 to 16 and one-half years on each rape conviction to be served concurrently to each other and consecutively to the felonious-assault sentence. In the case numbered B-2305890, he was sentenced to 11 years on conspiracy to commit murder and three years for intimidation. Those sentences were ordered to be served consecutively to each other and to the aggregate sentence in the case numbered B-2203078.

{¶49} The court made the following findings,

The Court finds under Ohio Revised Code 2929.14(C)(4), which

16

guides us as to consecutive sentencings; that consecutive sentences are necessary in this case to protect the public from future crime or to punish the offender. Consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.

The Court also finds the offender committed one or more of the multiple offenses while the offender was waiting trial, which is clearly applicable in the B23 case.

As to the consecutive sentences on the B22 case, the Court finds the offender's history of criminal conduct demonstrates consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶50}** Mosley now appeals raising five assignments of error.

### Sufficiency and Manifest Weight

**{¶51}** In his first and second assignments of error, argued together, Mosley contends that the trial court erred as there was insufficient evidence to convict him, and the verdicts were against the weight of the evidence.

**{¶52}** When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000). "[T]he question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt." *State v. Ham*, 2017-Ohio-9189, ¶ 19 (1st Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), paragraph two of the syllabus.

**{¶53}** In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* "Although an appellate court may review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily an initial determination for the trier of fact." *State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24.

**{¶54}** Mosley argues that the convictions were unsupported by the evidence and contrary to the weight of the evidence because the testimony of L.H. and the inmate was not credible. Mosley presents a manifest-weight argument, but does not make any arguments challenging the sufficiency of the evidence.

**{¶55}** Mosley concedes that with respect to the rape convictions, "it's a he said/she said situation." Mosley insists that his testimony was credible because L.H. gave different accounts of the events, which suggested that the sex was consensual, and L.H. admitted that she told Mosley that she loved him. Mosley did not flee after the alleged rape and instead remained in L.H.'s home sleeping, and he voluntarily made a statement and provided his DNA.

**{¶56}** Similarly, Mosley contends the conspiracy and intimidation convictions were based on the inmate's "self-serving testimony," and that the inmate orchestrated the entire scheme. The inmate suggested that Mosley kill L.H. and set the price.

Mosley was simply "mad and upset and said things he regretted." The money Mosley sent to the inmate's wife was for rent, and not a murder-for-hire scheme.

**{¶57}** L.H. testified that Mosley raped her both vaginally and orally. The State introduced evidence to corroborate L.H.'s account of the events, including Mosley's DNA on her breast, the knife that Mosley admitted was his, the photos of her injuries, the overturned furniture in the living room, and L.H.'s bloody clothing. L.H. can be heard on the ring videos pleading "no" and "please don't" while Mosley asked her if she wanted to die. During his testimony, Mosley admitted that he wanted to kill L.H. that night.

**{¶58}** With respect to the conspiracy and intimidation charges, the State presented evidence to corroborate the inmate's testimony. On the recordings made by the inmate, Mosley repeatedly said he wanted L.H. killed and stated there would be no case against him if she were dead. Mosley provided detailed instructions about L.H.'s daily routine, where she parked, her work hours, where she lived, and Mosley admitted to drawing a small map. Mosley devised a plan to secure the funds by having his brother sell his "tools." Mosley testified that he wanted L.H. dead, but claimed the inmate put the idea in his head. Mosley admitted that he wanted to kill L.H.'s granddaughter too. Although Mosley testified that the check to the inmate's wife was for rent, Mosley stated on the recordings that the money was for a hitman. Mosley never once stated that the money was for her rent on the recordings. Mosley's down payment for the murder, the detailed instructions he provided to the inmate, and the map he drew demonstrated that he took substantial overt acts in furtherance of the conspiracy.

**{¶59}** In considering a manifest weight challenge, this court weighs the evidence and considers the credibility of witnesses, however, we recognize that the

trier of fact was in the best position to assess the credibility of the witnesses. *See State v. Coleman*, 2022-Ohio-4029, ¶ 19 (1st Dist.), citing *State v. Landrum*, 2016-Ohio-5666, ¶ 17 (holding that "The trial court was free to accept the victim's version of the events and reject [the defendant's] story.").

**{¶60}** Here, the jury believed L.H.'s and the inmate's version of the events. This is not one of those exceptional cases in which the evidence weighs heavily against the conviction. And we cannot say that the trial court clearly lost its way and created a manifest miscarriage of justice.

**{¶61}** Accordingly, we overrule the first and second assignments of error.

### Ineffective Assistance of Counsel

**{¶62}** In his third assignment of error, Mosley argues that he was denied the effective assistance of counsel when his counsel failed to object to the consolidation of the indictments for trial.

**{¶63}** To establish ineffective assistance of counsel, Mosley must show (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). To establish prejudice, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. In assessing such claims, a reviewing court must remain mindful that "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *State v. Echols*, 2021-Ohio-4193, ¶ 40 (10th Dist.), quoting *Strickland* at 689.

**{¶64}** The State filed a motion to consolidate the indictments for trial. At the hearing on the motion, defense counsel stated,

> Judge, I've reviewed the motion, and I've had an opportunity to

speak with Mr. Mosley about the motion and what his options are. In talking to him about what the motion means, he has no objection to consolidating the matters for trial.

{¶65} Mosley contends that his trial counsel rendered ineffective assistance by failing to object to the consolidation of the indictments for trial. However, Mosley, after consulting with counsel, did not oppose the consolidation of the cases for trial. The decision not to object was the result of conversations between Mosely and his trial counsel that included Mosley's options.

{¶66} As several courts have concluded, the decision to proceed to trial with consolidated cases "may be a matter of counsel's trial strategy." *State v. Pridgett*, 2016-Ohio-687, ¶ 38 (8th Dist.); *State v Adkins*, 2004-Ohio-4019, ¶ 25 (3d Dist.) ("The failure to object to the consolidation of the cases could very well have been trial strategy."). Here, counsel represented that the decision not to object to consolidation was made by Mosely in consultation with counsel. Mosley failed to overcome the presumption that, under the circumstances, the challenged action "'might be considered sound trial strategy.'" *See Echols* 202-Ohio-4193 at ¶ 40 (10th Dist.); *Strickland* 466 U.S. at 689. Therefore, the failure to object constituted trial strategy and not ineffective assistance of counsel.

{¶67} We overrule the third assignment of error.

### Discovery Violation

{¶68} Next, Mosley avers that the trial court erred when it admitted the 911 call because the call should have been excluded as a discovery sanction and was unduly prejudicial.

{¶69} An appellate court reviews a trial court's sanctions for discovery violations for an abuse of discretion. *State v. Maynard*, 2023-Ohio-4619, ¶ 22 (1st

Dist.), citing *State v. Darmond*, 2013-Ohio-966, ¶ 20. A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary. *Id.*, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

**{¶70}** "Multiple appellate courts in Ohio have held that a trial court abuses its discretion when it fails to impose the least severe sanction for a discovery violation that is consistent with the purpose of the rules of discovery." *State v. McHenry*, 2021-Ohio-3118, ¶ 20 (2d Dist.), citing *State v. Lambert*, 1996 Ohio App. LEXIS 5163, *3 (6th Dist. Nov. 22, 1996) (finding an abuse of discretion where the trial court inquired into the circumstances surrounding a discovery violation, but did not impose the least severe sanction that was consistent with the rules of discovery); *State v. Warfield*, 2006-Ohio-935, ¶ 14 (8th Dist.) (finding the trial court's decision dismissing an indictment due to an inadvertent discovery violation was an abuse of discretion because it "went beyond the least severe sanction consistent with the purpose of the rules of discovery" and "was too severe . . . given the nature of the infraction"); *State v. King*, 2010-Ohio-5701, ¶ 24 and ¶ 75 (5th Dist.) (finding an abuse of discretion where the trial court did not impose the least severe sanction for a discovery violation, but instead "imposed the most severe sanction that it could").

**{¶71}** When the prosecutor located a 911 call made by L.H. that the State previously did not provide to the defense, he acknowledged the error and explained that the former prosecutor on the case had been fired. The prosecutor immediately provided a copy to defense counsel. The prosecutor requested the court to admit the call "given its relevancy." Defense counsel accepted the current prosecutor's explanation and stated that he was previously told a 911 call did not exist. Counsel requested the 911 call be excluded from evidence as a discovery violation.

**{¶72}** The prosecutor argued that exclusion would be the most severe

sanction, and requested that the court give defense counsel a continuance to review the five-minute call. Defense counsel requested additional time to listen to the call and possibly get a transcript because, "It's an important piece of evidence as it relates to the cross-examination of several of the upcoming witnesses." If the court agreed, defense counsel was fine to proceed in that manner.

**{¶73}** The court found that the violation was not willful and appeared to be inadvertent, the 911 call merely corroborated events, and that the caller, L.H., would testify. As a sanction, the court would allow the defense "very wide latitude on cross-examination" and a continuance if necessary. Mosley objected for the record.

**{¶74}** The record indicates that the court considered the necessary law and factors in imposing the least restrictive sanction available. Accordingly, we cannot conclude the court abused its discretion in crafting the least restrictive sanction for the discovery violation.

**{¶75}** Mosley also contends that the court erred because the call was not relevant and was unduly prejudicial because it was a trial by ambush, and 911 calls tend to incite sympathy from the jury. However, Mosley did not object at trial on relevancy grounds. Additionally, Mosely acknowledged that the call was relevant by stating, "It's an important piece of evidence as it relates to the cross-examination of several of the upcoming witnesses."

**{¶76}** Generally, "all relevant evidence is prejudicial." *State v. Crotts*, 2004-Ohio-6550, ¶ 23. As such, the rules of evidence only exclude "evidence that is unfairly prejudicial." *Id.* "Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision." *State v. J.L.S.*, 2012-Ohio-181, ¶ 39 (10th Dist.), citing *Oberlin v. Akron Gen. Med. Ctr.*, 2001-Ohio-248.

**{¶77}** Here, the 911 call was relevant, and we cannot say the recording

provided an improper basis for a jury decision and affected the outcome of the trial. "Though prejudicial to Defendant with respect to his criminal liability, it was not unfairly so. Neither did it confuse the issues or mislead the jury, being the subject of cross-examination that exposed whatever weaknesses the evidence may have had." *See State v. Lenoir,* 2003-Ohio-2820, ¶ 20 (2d Dist.) ("The evidence on the tape of Ms. Johnson's 911 call has a tendency to make the existence of facts concerning Defendant's beating of Adkins and his abduction of her more probable. Therefore, it was relevant. Evid.R. 401.").

**{¶78}** Accordingly, we overrule Mosley's fourth assignment of error.

## Consecutive Sentences

**{¶79}** In his fifth assignment of error, Mosley argues that the trial court erred by imposing consecutive prison sentences.

**{¶80}** Under R.C. 2953.08(G)(2)(a), an appellate court may review the trial court's consecutive-sentence findings, and it may "increase, reduce, or otherwise modify" consecutive sentences only if it "clearly and convincingly" finds that the record does not support the trial court's findings. "An appellate court's inquiry is limited to a review of the trial court's R.C. 2929.14(C) findings. *State v. Glover*, 2024-Ohio-5195, ¶ 44; R.C. 2953.08(G)(2).

**{¶81}** Ohio law contains a statutory presumption of concurrent sentences for defendants convicted of multiple offenses. *State v. Galinari*, 2022-Ohio-2559, ¶ 9 (1st Dist.). "The general principle set forth in the Revised Code is that concurrent sentences are the default and consecutive sentences are the exception." *State v. Hitchcock*, 2019-Ohio-3246, ¶ 21. To impose consecutive sentences, a sentencing court must make the mandatory sentencing findings prescribed by R.C. 2929.14(C)(4). *See Galinari* at ¶ 9, citing *State v. McKinney*, 2022-Ohio-849, ¶ 11 (1st Dist.). Under

24

R.C. 2929.14(C)(4), a trial court must make three distinct findings: (1) "the consecutive service is necessary to protect the public from future crime or to punish the offender," (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and (3) one or more of R.C. 2929.14(C)(4)'s subsections apply.

{¶82} Mosley does not contend that the court failed to make the requisite findings. Rather, Mosley argues the sentence was disproportionate because Mosley did not have a firearm, did not preplan the crimes, and was under the influence when he committed the rape. The record established that Mosley brutally raped L.H. then attempted to have her killed so that she could not testify against him. Mosley also wanted to kill L.H.'s granddaughter in retaliation for L.H. going to the police. Based on this record, the trial court's imposition of consecutive sentences was not clearly and convincingly unsupported by the record.

### Conclusion

{¶83} Having overruled Mosley's five assignments of error, we affirm the judgment of the trial court.

Judgments affirmed.

**CROUSE** and **NESTOR, JJ.,** concur.